One juror might find that those misconducts are so heavy they negate everything else, but another juror might say, yes, but it was only for a one-week period within a six-and-a-half-year incarceration that he committed this, and after that, his behavior was good, and before that, he didn't have any violence, and he never used the objects that he was found to have had in any way as an assassin. Escape is an assault, no attempt to use those objects at all. If I could make that argument, that would open the door, because the escape in City Hall involved his unfastening his handcuffs, correct? That would be really dangerous to allow that in. The fact that he never used those would open the door to the City Hall escape? Maybe. Maybe if that was raised, the judge could rule that way, but a judge could just as easily say the City Hall escape does not rebut the evidence that he didn't use those, and it was agreed. Everybody agrees he didn't use those objects. But the argument requires more, that he's not really a danger of using them, and the City Hall escape shows he's certainly a danger, and that, even if the door were not otherwise open, it'd get opened by that. Now, jurors could find that those objects show a potential for danger. Other jurors could find that even though there's a potential for danger, there's positive aspects that he didn't use it, and then they could weigh that along with the other positive aspects of how his behavior changed after he was caught, and he was punished, and he did his punishment, and then he came out again. And so, a reasonable juror could look at the way that his behavior changed and say, I can find, along with, as the defense experts would testify, that this is a man whose behavior changed who can live safely and effectively while behind bars, and for that reason, I could vote for life. And I think that's particularly valid in this case when you look at the struggle the jury had without that evidence in reaching a verdict. The struggle was after three hours, they came back and said they were deadlocked. Well, it was more than that. It was after one full day of deliberation, and they sent a note out to the judge. And then they got a standard outline. About that they were deadlocked. They had also asked some questions about the mitigation. They were obviously thinking about the case. They asked questions about whether mitigation could be, had it be before the crime, at the time of the crime, or after the crime. And I think the next day they deliberated most of that day, for five or six hours that day, until 3 o'clock. And not only do you have the deadlock note, but they rejected two of the four aggravating circumstances that the Commonwealth had put forward. And they are the two most heinous aggravating circumstances, that he created a grave risk to another person, baby Lisa, and that the murder was committed with torture. Mr. Love, let me ask sort of a basic question. Isn't it true that the most compelling argument in the penalty phase of a capital case for a Pennsylvania crime is, spare this man's life because you can rest assured he's going to spend the rest of his days in prison? That's the most compelling argument? I don't know that that is. At least in some cases. In some cases it is. Life means life in Pennsylvania, right? It does. And is that not significant when compared to a different time when jurors might think that if they're giving someone a life sentence, that might mean they would actually do 20 years in state custody? That's true. But Pennsylvania courts have also allowed judges to give instructions that even though life is non-parolable, it is subject to commutation. And that there is a possibility that in the future, a judge following, a governor following the proper procedures could commute a sentence. And we know that's rare. So if life means life, why would an effective defense lawyer put before the jury insistent efforts, persistent efforts by the defendant to escape? It seems like a really, that seems like an ineffective strategy, doesn't it? And as I said before, it's a question of balance that different people can see different ways. And so some lawyers might go that way, and that would be a strategic decision that would be subject to deference. But other lawyers might decide, yes, this is bad, but there are differences between the city hall escape and the possibility of escape from a maximum security prison. And that the city hall escape was long before. You think we should say that the jury would find solace in the notion that although Mr. Wharton will continue to try to escape, don't worry, he's in administrative custody, he will fail? That's the argument? The jury could find solace in the conclusion that the experts say he could be safely housed in a state maximum security facility where his risk of escape would be extremely minimal. And that his behavior since he's been incarcerated shows, and particularly since 1989, shows a growth and a progression to adjustment to prison and a willingness to abide by the laws. It's a willingness to abide that we've seen for the last 30 years. That growth and maturation is what actually happens. Do we consider the last 30 years, or do we have to stop in 1992? Well, I think that's not an easy question. And I understand that the jury, in terms of thinking of prejudice, we have to look at what could have been done in 1992. But in terms of looking at the credibility of the Commonwealth experts who testified that from the facts they draw an inference of negative adjustment, we have to look at that credibility and say that those opinions turned out to be wrong. And so what the... So if Mr. Wharton tried to escape in 1998, 99, 2005, you would say that that's fair game? That could be considered? I think you'd be arguing that we have to look at 1992. I might, but I also think that the other side, if Mr. Wharton had tried to escape in 2005, I think amicus would have been arguing that. They might have tried to argue it, but that doesn't mean we should consider it, right? That's correct. But I think it goes to the credibility. It goes to how any single juror might have viewed the expert testimony. A single juror could have looked at the competing experts, all of whom were very well qualified, and said, I think that the amicus expert is putting too much weight on what happened seven years ago and not enough weight on what's happened for the last three and a half years. And so I'm more persuaded by the defense experts. There's nothing in the record to suggest, in order to defeat a claim of prejudice, this court would have to find that every juror would necessarily have viewed the negative aspects more than the positive aspects. Every juror. And you would have to find that with some certainty, because my burden is only to a reasonable probability. And there's nothing in the record that provides that kind of certainty. There's nothing that's so overwhelming about the negative aspects of the behavior, in light of his positive aspects, that's so overwhelming. What about the awfulness of this crime, this campaign of terror against a family? Grizzly facts, to be sure. But, again, they were not facts that led the jury to be so concerned that the death penalty was an easy decision for them to make. And they rejected the elements of torture that could have involved mental anguish as well as physical anguish. And even the first jury in this case, although the first jury sentenced Mr. Wharton to death, they sentenced his equally responsible co-defendant to life. His co-defendant didn't force the woman's head down into a pool of water. I'm sorry? His co-defendant's killing was different from his killing. I'm not so sure that that's correct. I think they both were involved in the prior burglaries. They both were involved in the campaign of terror. One killed one. Equally bad strangulation involved. Did your client orchestrate this because he's the one who had the grievance against this family? I'm sorry? Your client is the one who had the grievance against this family for nonpayment. He's the one who orchestrated all of this. And I think the record supports this, but I can't say for sure. I think the co-defendant was also part of the crew that had done work that was aggrieved by the failure to pay. I thought there was evidence in the record the co-defendant said he couldn't go through with it and that he pointed the finger at Wharton for the second killing, the killing of – The co-defendant said that, but the jury convicted him of first-degree murder. So the jury obviously didn't accept that. So if we want to talk about aggravating factors, if the jury would have found four aggravating factors instead of two, your kind of mixed bag prison adjustment evidence wouldn't be nearly as persuasive, right? I think it would have shown that the jury did not struggle with this evidence before. I don't know if it would have been more persuasive. It might have been even more persuasive because it was more necessary to show the kind of change in his behavior. And that his behavior had changed since the time. All right, Mr. Levy, we reserve time for rebuttal. We'll hear you then. Thank you so much, Your Honor. Thank you. Mr. George, on behalf of the superintendent. Thank you. Good morning, if it pleases the Court. Paul George. I refer this Court initially to its own prior decision in this case, which I think makes three important points that were certainly important to the Commonwealth in reaching the position that it takes today. First, it was a virtual certainty that an untrained, underfunded, and unsupported solo practitioner who was handling his only death penalty case did not conduct the kind of investigation that this Court noted in its initial Wharton opinion was an important aspect of preparation. And that's the prison records. You're saying he was plainly ineffective under Skipper for not looking at the prison records. For being unaware that Skipper even permitted the kind of evidence that you could potentially secure by looking at the prison records. And so at that point, all of this Court's prior questions about whether or not it was deficient performance were answered by the evidentiary hearing when the gentleman testified himself that he wasn't aware that this was even an option. The other thing that this Court said in its initial opinion was that there was a prima facie case made out of materiality in this case. And finally, that this Court itself looked at the prison records, assessed what they saw in there, and made its own determination that they indicate that Wharton was adjusting well to prison life and that his behavior was generally satisfactory. Okay, so maybe our prior opinion says there's sufficient performance here. This evidence could be material, but we specifically remanded to look into the anti-mitigation evidence, too. Our Court remanded. It didn't render judgment. And so, yes, that's a good starting point, but it's only the starting point of the analysis. I agree that it's only the starting point. But for the Commonwealth, at least, we do look at the 30 ensuing years. We do look to see what expert made a prediction that was borne out by reality. I agree with counsel from before. The law is very murky. Are we supposed to theoretically take ourselves back to 1992 and listen to experts' testimony? For purposes of prejudice, we have to, don't we? I agree that we have to. It seems obvious. But is it really? What sense does it make to affirm a real-world death penalty based on the fact a theoretical jury would have done in 1992 if they were persuaded by experts whose testimony turned out to be inaccurate? That's because the law requires us to do a counterfactual hypothetical at a particular point in time. It's not ours to choose that. And I agree with counsel's previous point, however, that in assessing the credibility or the persuasiveness of the experts, we must recall that equally qualified experts looked at the records and made conclusions that were different from the amicus' experts. I find it curious that the amicus' experts were apparently uninterested in whether or not their predictions were going to be accurate because they appeared to be surprised during the hearing to learn that Wharton had 30 years of unremarkable behavior. They appeared to have never even asked the amicus' that retained them, was our prediction right? If we testified in 1992 that this guy was going to continue to be a big problem in prison, would that turn out to be accurate? It turned out that they hadn't seen his records afterward and hadn't asked to see them. And I can't help but feel that that's a remarkable aspect of their testimony. We can't assess with certainty how a 1992 jury would have attributed what... All right, you're laying blame at amicus for not looking at documents of recent vintage. But what about your office's failure to investigate the most basic of documents that were existent from prior to 1992, which are clearly relevant? And which documents in particular, sir? A criminal record search? All that I can say in response to that is I disagree with counsel. First of all, in one respect, I think when you put on evidence that your client is a good guy, there would have been nothing to prevent the Commonwealth from introducing evidence to say he's not such a good guy. Look, he tried to escape. I think that evidence would have been admissible back then. For some reason, the Commonwealth elected not to introduce it. Then in the ensuing decades of litigation where the Commonwealth vigorously supported the death penalty in none of their briefing, was it ever mentioned that this escape occurred? All right, so after the remand from our court, when you were on notice that you had to consider mitigation evidence, the prison records, the good behavior, and anti-mitigation evidence, it would stand to reason that you would advise the district court that the anti-mitigation evidence, which looms large, including the escape attempt, and the escape tools, misconducts in the prison, that you would have proffered those directly for the district court to look at and evaluate. And that didn't happen. I agree, because if you read every single document that was ever submitted to this court or any other court. It's not every single document. You were well aware of all of the Program Review Committee reports about good adjustment, correct? Yes. Right within those documents, right within them, and we can go through them if you'd like, is the evidence of the severe misconducts for possessing the antennae in the cell. They're mentioned right in the Program Review Committee reports. Nobody ever attempted to deny the existence of that. I thought you were referring to why didn't you tell the court about the escape attempt. Also, why didn't you tell the court about all of it? It just seems passing strange that your presentation to the court was heavily focused on one side, and that in and of itself is not passing strange. That's why we have an adversary system. People tend to present their case in the best light, favorable to them. What's passing strange is you presented the case in the light most favorable to your adversary, which is how we ended up with amicus being appointed in this case. What am I missing about that? Well, one thing that we were certainly informed by this court's own opinion, which pointed out the deficient performance, the prima facie case of materiality, and the fact that on balance the prison adjustment records appeared to be positive. That certainly affected us. On the other hand, we also took a look at what did the individual's behavior turn out to be in the ensuing 30 years. And someone else will have to make that argument that on the basis of experts' predictions of future behavior. But again, in terms of, I know we're going to argue this in the next case, but in terms of candor to the tribunal, perhaps we wouldn't have the second case had you gone into the district court and said, Judge, there's a lot of evidence to show that this fellow's adjustment in prison was not all good. There were some severe problems. But we think as a policy matter, it's really important not to affirm a death sentence for somebody who has shown 25 or 30 years of good behavior in prison. Now, that could be a really credible policy argument. It's quite inconsistent with the law, consistent with what Judge Bibas said about what we are required to do, namely to turn back the clock to 1992 and do this counterfactual evaluation. Agreed, sir, but the lower court never asked us for that. We notified the lower court of our concession in the manner that had been done on many occasions, both before and after the present district attorney took office, and at no point in time prior to the hearing itself was an explanation for the change in our position requested. Now, those other concessions of relief, pardon me, sir. Yeah, go ahead. Those other concessions of relief, which were presented to different district courts in exactly the same manner, had never prompted the same sort of response. Well, I think that might explain what happened here. I mean, you might have been, if the district court here in this building was rubber stamping concessions made by your office, then I guess it would make sense that you would rely on that continuing to happen, but I don't know what we're to make of that. I mean, are we supposed to reevaluate all of the other cases where your office conceded positions and the district court adopted them without inquiry? Well, if you were to do that, you'd have to go back many, many years. I mean, there are at least 28 cases that I've identified where there were concessions of death penalty relief at the common police court level in Philadelphia County before the present administration ever took office. So concessions of relief are nothing new with respect to Philadelphia County's death penalty. Well, but those are the cases in chief. Those aren't on habeas, right? Those are cases that are in collateral review. There are cases where PCRA petitions were brought in the common police court and where prior administrations did exactly what we did here, conceded relief. All right, but if the common police judge on collateral review accepted the concession, that's just not a matter for the federal courts, correct? It's not necessarily a matter for the federal courts. We've got enough on our plate. We need to stay focused on what's of concern to the federal courts and this court in particular. Yes, sir. But such concessions, as we pointed out in the court below, were routinely made before, and they weren't just made by the present administration. I'd like to turn our attention back to the facts of this case for a moment, if I could, and just point out that, you know, the whole proposition that's been made by the amicus and by the court below, that it's of negligible import how long the jury deliberated here and how they at one point notified the trial court that they were deadlocked, is significant. And I'm quite sure if it was the other way, if a unanimous jury had come back in five minutes and said, we want death, that I'm not so sure they would be taking that same position. And my only point there is simple. It seems like such common sense to say really terrible underlying facts automatically means death penalty for every rational, non-idiosyncratic juror. But experience tells us the contrary. It's not that easy. But it's not just that. I mean, I agree with you. You can't just jump from the anuses of the crown, maybe incline things one way. But you have the fact that, you know, the escape attempts and the escape paraphernalia, just they're objectively a lot worse than taking some GED classes and not getting into trouble for a while. I mean, maybe it's not quite a brick on one side of the scale and feather on the other, but maybe it's a dozen feathers against a brick. It's still kind of hard to see those balancing out in a reasonable juror's mind. Well, that's one person's assessment. And I think it's what people think will be the common sense assessment. Again, this looks bad, so every juror will have to decide a certain way. We can look at it in light of the closing argument where future dangerousness was the one significant argument. If we set aside a general plea for mercy and a tax on the witnesses, the argument really was future dangerousness. It wasn't, you know, impoverished upbringing or mental deficiencies or any of those other things. But there were twice references to he's going to spend the rest of his life in jail. So we have to look at that in that context. I agree that you must look at it in that context, but I don't agree that the stone and feather analogy. I think for one juror that might very well be 100% accurate. But experience teaches us that jurors, notwithstanding their death qualification, will at times fasten onto positive aspects of the defendant's character and find that they have more weight. What could be more grim, you would ask, than the facts in this case? If we're going to kind of get into the juror's mind, you're asking us to do it based on what the new evidence would be. And if the doors open to escape and making keys, maybe the closest juror, the juror that was the longest holdout, hypothetically, at the 1992, if that new evidence came in, maybe the escape, maybe the making the keys would have moved that juror far away from being the closest juror and would have made this a very easy case for that juror. We have to at a minimum account for the fact that the closest juror with the new evidence might not still be the closest juror anymore. Well, first of all, we don't know now how many close jurors there were. This isn't a case where somebody came out, the foreman sold the judge, we've got a juror back here who's refusing to deliberate. They'd only send a note back that said they were deadlocked. But I agree with you that perhaps most of the jurors would have assessed it just like that. But maybe there was another juror who said, based on those qualified experts, as it turns out, accurate predictions that the guy is going to adjust, that's enough, that's all I need. But what that tells me, though, what that tells me, though, is that our data set, I think in a light favorable to you, that is that the jury was, this was a close call for the jury. We don't know that that's not a given anymore. Because we'd have to look at the escape attempts and the making of the handcuffs. And so when that new evidence comes in, we can't really say, gee, it was a close call. It was a close call on that record. But at one level, if we want to make a new record, we don't know anymore that it's a close call. Well, we don't know. I certainly agree with that. But when you assess the impact of that additional evidence that the jury didn't hear, you must also factor into it that they didn't hear from the experts that the defense presented. Experts who said, it turns out accurately, as this guy gets older, he's going to calm down and he won't be a problem. But at the time you made your concession, you didn't know about the escape, right? That's correct. So you had, at least arguably, at the time you made the concession, you had much firmer grounds for making the concession than you do now, based on what we know now. Would you at least admit that? Well, I cannot totally agree with it, sir, because of what I just said. That seems to disregard all of the probative value of the escape evidence. I don't ask you to discard the probative effect of it or its probable impact on most of the jurors. But remember what we're talking about here is a reasonable probability that one juror might have found the defense experts persuasive and adhered to the opinion that life was the appropriate sentence based on the prediction that the guy was going to calm down and quit being such a menace to society. Mr. George, what are we to make of some of the statements, the pages at the end of your brief about what you argue to be the unfairness and inappropriateness and outlandish expense associated with the death penalty? Well, all I did was quote the Attorney General when I said that. What I was saying there is that our decision here was necessarily informed by what we learned by evaluating the death penalty cases. It sounded like a strong statement that you were making that this case isn't about whether Mr. Wharton had a good argument under Section 2544, but rather there's never a good argument. It just seemed to be a broadside against the system. And again, accepting for your benefit that everything you said there is persuasive, I'm not sure that that helps us or it helps support the notion that your office took a hard look based on the extant law as to whether Mr. Wharton had a good habeas case. You understand my point? I understand the question. But I think our point actually was that the deficiencies that are apparent here were symptomatic of what happened in that era in Philadelphia County with the death penalty, where you consistently had exactly what you had here, an underfunded, unsupported, untrained person handling a death penalty case of significant impact entirely on their own. And it's just pointing out that it's an example of the problem. And habeas relief should be granted in all such cases? No. We looked at the facts here in this case, and we, as I say, I can't help but underline the fact that it informed the stance we took that the guy has not been the ongoing menace over the ensuing decades that the experts from the amicus were so ready to predict that he would be. And you can keep going. Well, I don't have anything in addition to add here. I stand ready to answer any questions that this court may still have for me. I think we're out of questions. Thank you, Mr. George. We'll hear from counsel for amicus, Ms. Mahler. I'm sorry to do this to you, Ms. Mahler, but could you start where I sort of left off with Mr. George? He cited, he quoted then Attorney General, now Governor of the Commonwealth, some statements made about the death penalty, et cetera. Can you address those comments in their brief and what salience they have to this case, if any? Absolutely, Your Honors. Good morning. I'm Carrie Mahler on behalf of the Office of Attorney General, the amicus curia in this case. Your Honor, to simply answer your question, I would say they have zero relevance in terms of this case and the claim before the court in terms of whether counsel was ineffective for failing to present so-called positive prison adjustment evidence during the relevant time period. I think, if anything, Judge Hardiman, as you sort of alluded to, it seems to show more of a broad scale of evidence. It's more of a broad scale sense of an ideological overview of death penalty cases in general and not this course in particular. So maybe just to tease that out, if a district attorney's office could give a notice of concession in a habeas case based on its broad views of the death penalty and its application, untethered to facts or law, how is that different than a governor's function, a function usually reserved just to the public? Is the DA now kind of, is a DA that would do that kind of taking power that would otherwise be reserved to the governor through a notice of concession in a habeas case? I would say it's similar, it's a similar analogy, but I don't think that any of that has to do with the current issue before the court in terms of whether counsel was ineffective. So ineffectiveness, we've got the two prongs of Strickland. Let's talk just briefly about prong one first. So, you know, Mr. George argues with some force that our prior decision in this case is least law of the case, and therefore that's deficient performance. And on top of that, you know, he might have added that the Supreme Court generally will unwilling to second-guess, but in failure to investigate, it will not be willing to second-guess. In death penalty cases, we have Wiggins, we have Williams, we have Rompillo, where the court says, you've got to at least find out what's there before you make a tactical decision about whether to introduce it or not. So what do you say about those? Is it something that you concede or are not contesting, or is there a basis to question whether it was deficient performance in the first place? Yes, first of all, as Your Honor recognized earlier, the 2018 remand opinion was remanded specifically for a hearing because the Third Circuit recognized that it needed a complete developed record of anti-mitigation. So clearly the court at that time did not have all the information in terms of what counsel did or did not do in this case and the impact of that, mainly if there was significant anti-mitigation evidence. So counsel cannot be ineffective for failing to investigate unless counsel has an objective reason to believe that they're going to find information helpful to their clients. Strickland says that. So in this case, I think we have to first look under an objective standard, as Your Honor recognized earlier, what counsel knew at the time prior to the 1992 penalty phase hearing. Counsel testified that he knew of Wharton's violent premeditated escape from City Hall. Under those circumstances, counsel had represented the defendant for about 10 years from 1984 to 1993. He knew his client well, he was actively working on this case at the time of the 1986 escape attempt, he was well aware of it. Looking at that under an objective, reasonable standard, what reasonable attorney would think it's a good idea to look into their client's prison adjustment knowing that he had a violent premeditated escape attempt from City Hall. Instead, counsel, while preparing for a penalty phase, is going to use their limited time and their limited resources to focus on investigations that are going to be fruitful to their client and helpful to their client. They're not going to go down this road of prison adjustment knowing that their client had the worst possible prison adjustment evidence out there, a violent escape from custody. Well, why, though, why wouldn't he look into the state prison adjustment and then try to make a legal argument, potentially? Not saying he would ultimately settle on this, but at least potentially he would look at the state prison adjustment and then consider proffering that to the sentencing jury while filing a motion in limine to exclude the 86 escape attempt as unduly prejudicial because it's a felony. Because it was in county and it was in relation to a separate crime. At least theoretically, he might have, a good lawyer might have considered those things, right? He might have considered it, Your Honor, but it certainly would not have been successful. If the claim is that his client had positive prison adjustment, then you're looking at the client's behavior and conduct while in custody. Therefore... Well, but state custody is different than county custody, right? I mean, especially he was consistently, was he not, in, because he was on death row. He was in either AC administrative custody or the RHU, was he not? Correct, Your Honor, yes he was. And isn't it true that that's a more secure environment and that someone is a lot less likely to even have the opportunity to cause trouble in the prison, much less escape? That's correct, Your Honor, and the fact that this inmate, Mr. Wharton, had six misconducts during that seven year time period, and that's something that former Secretary of Corrections, Jeffrey Beard, noted, is that this was an inmate who didn't just have those two serious misconducts for possession of contraband, implements of escape, but also all the way from the beginning, all the way to 1992, had consistent misconducts. Well, I don't think, you know, petitioning and taking a survey in the jail was going to cause the jury to look negatively upon him, right? I mean, it was conceded, was it not, that the other four misconducts were minor? Yeah, that's correct, Your Honor, the other four were minor, but that is something that Jeffrey Beard testified to, that this wasn't just an inmate who started and took, you know, a year or a short period of time to adjust and then had perfect prison adjustment. But still, even without the escape, even if we take that out, we still have two very serious misconducts of possession of contraband, implements of escape, one of which was fashioned into the shape of a handcuff key. But I think the fact remains, the facts we have is, we have the escape from City Hall, and then we have just three years later, we have those two very serious misconducts. And the common theme between the two of them, which is the handcuff key, when Warren was brought down for sentencing in his unrelated home invasion robbery case, he apologized for the crimes that he committed, said, I'm going to use the time in custody to better myself, all the while he's hiding a handcuff key. He then pushes a deputy sheriff, runs down the public hallway in City Hall, runs down the spiral public staircase in City Hall, and has to be shot twice to be apprehended. The handcuff key was found at the elevator, where he effectuated his escape, and that he used to uncuff himself. Then we have just three years later, while he's demonstrating superficial positive prison behavior, being polite, being cordial, playing chess, writing poetry, these unremarkable tidbits of so-called positive prison adjustment, while he's hiding these possession of implements of escape, he's using the handcuff key. A makeshift handcuff key, it's the combination of the two that need to be seen together that show a theme here. He is... But all that goes to prejudice, that doesn't help you with deficient performance. I think it goes to both, Your Honor, because if you're looking at... Isn't the law, the law seems really clear that failure to investigate is going to be deficient performance. It's either harmful or that's fruitless to your client, and that's strickland, that you can't be, counsel can't be... But how can you know, you can't know whether it's harmful until you investigate? Well, if you have reason to know, if you have reason to know it's harmful, and in this case, counsel... So your argument is, your argument is very targeted to the escape. Your argument, as I understand it, is that because this lawyer knew about the escape, then any good lawyer would have put the blinders on and not wanted to go down the road of prison adjustment. That's your argument? Well, there wasn't a time issue here, I mean, there wasn't a lot of... I mean, the mitigation was standard, loved ones and family, that people cared about him, and they were the pleas for mercy that we see all the time in death penalty cases, wasn't it? Yes, Your Honor, it was family members testifying... So it wasn't like he had a resource allocation issue where he was spending all kinds of time investigating other things. I mean, he interviewed the family members, and the family members testified to positive attributes. And his mother testified that his life should be spared because he's never going to get out of custody. So your argument is that because Mr. Cannon knew that he at least once tried to get out of custody, that he just should have avoided anything having to do with prison adjustment. Yes, I think that gives him an objective, reasonable basis for not going down that road. And then in terms of presenting it, the objective standard would say that counsel was reasonable for not opening the door to the escape. Okay, but that's what I'm challenging on. Opening the door is a second-order issue. You can't know whether you're opening the door until you gather the information. I'm pressing you on the point that he should have at least gathered the information, and then perhaps made a strategic decision not to proffer the information, because it would open the door and would do more harm than good. And then upon looking at the information, counsel would see that opening the door would lead to catastrophic consequences for his client when he's trying to argue that his life should be spared. So, I mean, at one level, if we're in the mind of the defense attorney, the attorney knows there's an escape. And then they're thinking to themselves, thinking to themselves, what could I possibly learn by way of prison adjustment? What would be the best, if I did the greatest investigation ever, what would be the absolute best prison adjustment evidence I could come up with? And I'm not sure what exactly that would look like, but what you're saying is when he's doing that thought experiment, almost nothing, in your view, would eclipse this, if he got a GED, if he attended religious services every day, if he kept a diary demonstrating a clear conversion, pick the best possible stuff he could ever have. What you're saying is it was still reasonable for counsel to say that that can't eclipse the escape attempt, and therefore I'm not even going to look for that, in the off chance that I had the best case scenario. Based on the escape, yes, I think if you would take the escape out of it, it's a much different conversation. And we just have the implements of escape misconducts, it's a different analysis. What do we do with the DA's failure to use this escape through all these years? Your friends on the other side make a big deal out of it, is that relevant? No, Your Honor, it's not relevant, and I certainly am happy to address that. Let's first look at the 1992 penalty phase hearing. At the 1992 penalty phase hearing, the escape evidence was not coming in unless the door was open. The Commonwealth was extremely limited and restrained to what it can present at that penalty phase hearing. The underlying facts of the murder, the aggravating circumstances. How do we know that? Their argument, the DA's argument, is that it could have come in to challenge the good character evidence that was put in favor of Warden. Your Honor, I respectfully disagree. I think when you have a case like this, and a prosecutor who is looking at four aggravating circumstances, the heinous facts in this case, the prosecutor is not going to take the risk of trying to get it in, in terms of refuting character. He's not going to poke the bear if he doesn't need to. He had everything he needed in this case, he already had four aggravators. So the prosecutor was not going to risk trying to interject it, create a possible issue for an appeal, create a possible mistrial, by trying to get the escape in some other way. That escape was not coming in unless the door was open with positive prison adjustment evidence, or to refute the E1, no significant history. How do we know that? What case supports your argument? All I saw in your brief and the other side's brief were these statements, these ips and dixits, that they say it was coming in, or it could have come in, and you're saying it couldn't have come in. And I don't know who's right, because nobody's cited the authority to tell us. Well, I think the bottom line is, Your Honor, it really doesn't matter for where we are right now, in terms of assessing this claim, and what would have happened if the door was open to the positive prison adjustment evidence. In terms of why the Commonwealth did not raise the escape in the PCRA proceedings, the 1997 PCRA proceedings, the claim was raised in a 150-page amended petition. It was one of 23 claims. The records, the DOC records that were then attached, weren't even part of the record until in response to the 907 Notice of Intent to Dismiss. Then the case was dismissed without a hearing. There was no reason for the Commonwealth to even expand the record at that time. It was defendant's burden. In terms of why the escape wasn't raised pre-remand before the district court, the Commonwealth was working within the record that the defendant himself created. It was the defendant's burden. The Commonwealth's argument at that time was that the state court's decision was reasonable based on the record before the state court. The Commonwealth was not going beyond that record in making its arguments. There was no reason to discuss the escape then. The only reason for that to come in was after our remand order? Correct. The remand, when this court said we need to look at this issue more closely, we need to look at the anti-mitigation evidence, that's when it was directly relevant to a claim of so-called positive prison adjustment evidence. Thank you. Your Honors, do you have any other questions? No. We'll hear the rebuttal of Mr. Lev. Thank you, Your Honors. Let me start with Mikas' statements about the handcuff key at the time of the City Hall escape. Mr. Wharton had been charged, because there was no evidence in the record that he had a handcuff key at the time of the City Hall escape, he was charged with that, it was said so in the complaint, that's the only evidence there is. Those charges of possession of the handcuff key were dropped at the time of his plea to escape. On the factual basis of the guilty plea that he entered into escape, there was no mention of the handcuff key. The factual basis says only, I've had the facts of this case read to me. We don't know what those facts were that were read, if it was just limited to the escape. So the story about the handcuff key being found by the elevator and being traced to Mr. Wharton and Mr. Wharton undoing his handcuff key is not in the record. So if that's the tie, then they didn't put that in the record, below. In the end, I think, you know, what this case comes down to is the reason why Mr. Wharton was charged. It's the reasonable probability of one juror's standard and what it means when evidence cuts both ways. The Supreme Court in Williams, in Porter, has recognized that mitigation often has both positive and negative aspects to it. And that when lawyers are supposed to look for records, they do so knowing that there may be positive and negative aspects to it. The Supreme Court recognized that in Alton v. Kearney and Abdul Salaam v. Secretary of DOC. The Supreme Court has recognized it repeatedly. Are you saying that there is kind of a categorical rule here that when evidence cuts both ways, the one juror's standard is satisfied? Not necessarily. It depends on the weight of the evidence. We have to look at a little bit of how strong the evidence is that cuts both ways. Yes. So if, for example, Mr. Wharton had used his handcuff key to try to escape while he was in prison, and in doing so had assaulted or killed corrections officers doing that, that would be a very different story and entitled to very much greater weight than the fact that he possessed, but didn't use those pieces of antenna during a one-week period. In six and a half years of incarceration. So yes, there is weight, and it's going to come down to the question of how much weight could a single juror, could a single juror in this case, have found that the positives outweigh the negatives? And there's credible expert testimony that a juror could have relied on. There's the records themselves of Mr. Wharton's change in behavior and his growth and maturation. And as for the expert testimony, we look at that de novo, this court. I assume it's your position that Judge Goldberg's weighing of that expert testimony is not entitled to deference. Is that right? That's right, because I think as even Judge Goldberg recognized, it's not, the question wasn't for him to decide which expert should be weighed more, right? The question wasn't for him to decide whether his, whether Mr. Wharton's behavior was positive or negative. The question was, is there a reasonable probability that a single juror could have accepted the defense expert over the amicus expert? Right, but doesn't the expert testimony inform that decision? It does, and Judge Goldberg's opinion is filled with recognition of the positive aspects of the defense expert. And in the end, what Judge Goldberg found was that he agreed, and I don't know that that's the right standard, his agreement. But he agreed with Dr. Beard's testimony that the positive behavior represented the minimum amount of weight that a single juror could have. And that's the minimum standards that prisoners expect. But that's not entitled to deference for an inmate. Well, even if it is, I don't think it is entitled to deference, but even if it is. We have to make our own evaluation of that testimony and how much, if at all, it informs the one juror standard. And look at what that means. If the minimum expectation of a prisoner's behavior is good behavior, good reports, no negative reports, no violence, some negative stuff, but mostly positive stuff within it, if that's the minimum expectation, that's pretty good. That's a pretty decent standard of good behavior at a minimum expectation. If the minimum expectation is mostly positive behavior and continued growth of an inmate, then that's something a juror could rely on. To say, you know, even given the amicus experts, I can see that there's reasons to vote for life in light of the other evidence, the other mitigation, about Mr. Wharton's good qualities and his cooperation with the police at the time of his arrest, the things they found as mitigation. So you have to evaluate whether one, whether you weigh all the positive evidence against the significant negative evidence and see if it really does cut both ways or if it only cuts one way. If it only cuts positively, then I lose. If it cuts both ways in this case, then Mr. Wharton should be granted relief. Thank you, Mr. Webb. Can we take a five minute break? Thank you for, and thank you to Mr. George and Ms. Mahler for the extensive briefing and very helpful argument. We'll take the matter under advisement and we'll take a five minute recess.